## STRONG, Respondent, vs. HOSKIN, Appellant.

*May 23 — June 21, 1893.*

*Contracts: Partnership: Chattel mortgage: Conditional sale.*

1. The lease of a farm for one year provided that its object and the principal business to be conducted on the farm was the raising and sale of stock; that the lessor furnished certain stock and all the hay and feed on the farm; that the lessee should take care of the stock, should make exchanges, and should purchase additional stock to be paid for by the lessor or on his own account; that all said stock should be pastured for the joint benefit of the parties, the use of the farm being regarded as an offset for the services of the lessee; that any surplus of hay or grain raised on the farm should be divided between the parties; that all the stock fit for market should be sold in the fall, and after paying each party for the stock furnished by him, with interest, the balance of the proceeds should be divided equally. There was no provision for keeping the property of each party separate. *Held*, that the property contributed to this joint enterprise, and accumulated in the prosecution of it, was joint property.

2. By a settlement in writing between the parties the property was divided, but it was stipulated that the ownership of the lessee's share should be retained by the lessor as security for the payment of a note. All the property remained on the farm in the possession of the lessee. *Held*, that the instrument was a chattel mortgage which, to be of any effect as to third parties, should have been filed as such.

APPEAL from the Circuit Court for *La Fayette* County.

Replevin for cattle.   In January, 1889, plaintiff owned a
farm near Darlington, La Fayette county, and had thereon
thirty-eight head of cattle, together with hay and feed.
January 16, 1889, he leased the farm to Joseph Moore by
written agreement for one year, which lease, after provid-
ing that the object of the lease and the principal business
to be conducted on the farm was the raising and sale of
stock, contained the following provisions:

"The said party of the first part hereby furnishes to said
party of the second part the following stock, to wit: Six
old cows; six heifers, three year old past; one steer, two
year old past; seven heifers, two year old past; five steers
and three heifers, one year old past; and ten last spring
calves (five steers and five heifers); in all, thirty-eight head,
which are hereby agreed to be of the value of —— dollars;
and he also hereby furnishes to said party of the second
part, for the purposes of wintering said stock, all the hay
and feed now on said place; and said party of the second
part agrees to feed, take care of, and winter said stock.
And said party of the first part agrees to pay for such ad-
ditional steers as said party of the second part may from
time to time purchase to be pastured on said farm, and the
said thirty-eight head of stock and such additional steers
shall be pastured for the joint benefit of said parties in
manner following: Said party of the second part shall,
whenever he can, exchange said cows and heifers for steers,
with the object of stocking the farm with steers in the
spring and selling them in the fall.   The use of the farm
for pasturage shall be regarded as an equivalent and an
offset for the services of the party of the second part in
the purchase, exchange, and sale of all stock which may be
on said farm or may be purchased, and for feeding in win-
ter any which may be wintered, and for seeding down any

part of the land, and for cutting and securing any hay on said farm or any grain that may be raised thereon; and whatever surplus of hay or grain there may be, which shall not be fed to the stock, shall be divided equally between said parties,— the grain to be delivered in the city of Darlington, and the hay in the stack on the farm. All live stock fit for market shall be sold for cash in the fall, at such time and place and for such price as the said parties shall mutually agree upon; and of the proceeds of such sale the said party of the first part shall first be paid the sum of —— dollars, and interest thereon from this date at seven per cent. per annum, and also such sum as he may have paid for any additional stock purchased for said farm, and interest thereon from the date of such payment at seven per cent. per annum. And if the said party of the second part shall have purchased on his own account and paid for any of the stock which may be so sold, he shall be repaid such sum as he may have so paid, with interest at seven per cent. per annum. The balance of the proceeds of any such sale after such repayments shall have been so made shall be equally divided between said parties."

Moore went into possession under this agreement, and proceeded to feed and pasture the stock. In April, 1889, *Mr. Strong* put on the farm eighteen more steers purchased from one Bray, the purchase being made through Moore. Under the lease Moore from time to time exchanged cows and heifers for steers. There was also evidence tending to show that Moore purchased with his own means, from one West, four or five steers in April, 1889, and placed them on the farm.

In July, 1889, Moore bought a butcher shop in Darlington, and gave a four months note for $250 in payment or part payment therefor, which note *Mr. Strong*, the plaintiff, signed as joint accommodation maker.

On the 24th day of October, 1889, Moore and *Strong*

settled their business relations, and reduced the terms of the settlement to writing as follows: "This witnesseth that *Moses M. Strong* and Joseph A. Moore have this day agreed upon the following terms of settlement in relation to his occupancy of the Cutting farm during the past season, and in relation to the stock upon the same. The said *Strong* is to have the seventeen surviving steers of the eighteen purchased from John Bray in April last (one having died), also three of the best other steers which were received from Narcisse King or acquired by exchange, making a total of twenty head of steers which the said *Strong* is to have, and which are to be kept by said Moore and fed out of the oats raised on said place until they are sold; and the said Moore is to sell the same for the said *Strong* as soon as in his judgment the best price for the same can be obtained, and the proceeds of such sale to be deposited in the Citizens' National Bank of Darlington, to the credit of said *Strong*. And all the other stock, grain, hay, and feed upon said farm is to be the absolute, individual property of said Moore, whenever he shall have paid a certain note for $250 dated July 29, 1889, payable to George F. West, cashier, or order, four months after date, with interest at eight per cent. per annum, for the payment of which the ownership of said stock is to be retained by said *Strong* as security. And each party hereby releases and discharges the other from all other claims and demands." This agreement was never filed in the town clerk's office. Moore did not pay the $250 when due, and *Mr. Strong* finally paid the debt evidenced thereby in October, 1890, just prior to the commencement of this action. No actual division of the cattle seems to have been made after the execution of the last agreement above quoted, but all the cattle remained on the farm, without change, in charge of Moore. On the same day of the settlement, and immediately thereafter, *Strong* leased the farm to Moore for five years from January 1,

1890, and Moore was in possession of the farm and all the cattle, under this lease, after that date.

In October, 1890, one Nethery, a creditor of Moore, sued Moore; and a writ of attachment was duly issued, by virtue of which the defendant, *Hoskin*, sheriff of La Fayette county, seized, of the cattle upon the farm, six steers, three cows, and three calves, as the property of Moore. There was evidence tending to show that Nethery had been told by Moore, prior to the seizure, that the cattle seized belonged to *Mr. Strong*, but this was denied by Nethery.

The plaintiff thereupon commenced this action of replevin for the cattle so seized by the sheriff, claiming to own the same; and the defendant justified under his writ, claiming that the stock seized were the property of Moore. The testimony was conflicting as to the identity of the cattle which the sheriff seized. The evidence seems to be quite clear that some part of the stock seized was stock which had come on the farm subsequently to the first agreement, by exchanges made by Moore under the provisions of the said first agreement. There was evidence tending to show that two of the steers taken were steers bought by Moore on his own credit. The circuit court ruled, substantially, that the cattle placed on the farm under the agreement of January 16, 1889, and their natural increase, as well as the cattle which had been received in exchange for such original stock, was the property of *Mr. Strong*, and that the agreement of settlement, of October 24, 1889, was a conditional sale of part thereof to Moore, which was valid and binding as to the plaintiff in the attachment suit, if he had actual notice of *Mr. Strong's* rights, though the agreement was never filed; and instructed the jury that if they found for plaintiff their verdict would be for the value of so many of the cattle seized as were received by Moore under the contract of January 16, 1889, and the natural increase thereof. The jury returned a verdict for the plaintiff, with

damages amounting to $166.75, and from judgment thereon defendant appeals.

For the appellant there was a brief by *Wilson & Martin* and *Calvert Spensley*, and oral argument by *R. J. Wilson* and *Mr. Spensley*.

For the respondent there was a brief by *Orton & Osborn*, and oral argument by *P. A. Orton* and *Moses M. Strong*.

WINSLOW, J.   We cannot agree with the conclusions of the circuit judge, that the stock placed on the farm by *Mr. Strong*, and its increase, remained his sole property, and that the agreement of October, 1889, was simply a conditional sale of a part thereof to Moore.   The terms of the agreement of January, 1889, seem to us to preclude such an idea.   By the terms of this agreement the parties unquestionably entered on a joint enterprise for mutual profit, namely, the pasturage and sale of cattle.   To this joint enterprise the plaintiff contributed the use of the farm, a lot of cattle, and feed.   The defendant contributed his personal services in feeding and caring for the cattle, raising and securing hay and grain, and exchanging and selling stock.   Each party had the right to purchase and put on the farm additional stock.   The live stock fit for market were to be sold in the fall, and each party repaid what he had paid out for stock, with interest, and the balance of the proceeds equally divided between the parties. We can see no escape from the conclusion that the property which is contributed to this joint enterprise, and which is accumulated in the prosecution of it, is joint property. Certainly, Moore had an interest in the property more than that of a mere custodian or care taker.   He became something more than a hired man.   There was a common stock in trade, to which it was contemplated that each should contribute, and receive credit for his individual contributions.   The property was not to be kept intact or *in specie*,

but selling, trading, and exchanging was provided for and contemplated, with no provisions looking towards the keeping of the property of the parties separate and distinct. When a general sale was made in the fall, each was to receive back his cash advances with interest, and the balance realized was to be divided equally. What element of a joint adventure for mutual profit is lacking here? We perceive none.

This construction of the agreement of January renders very plain the nature of the agreement of October. The parties met to settle their joint enterprise. They proceeded to sever their ownership of the joint stock of cattle, grain, and feed. They agreed that *Mr. Strong* should take twenty steers as his individual property, and Mr. Moore the balance of the property, subject only to a lien thereon in favor of *Strong* in the nature of a mortgage to secure him from damage on account of his signature to Moore's note. The inevitable effect of this construction is to make the instrument a chattel mortgage, which must be filed in the proper office to be of any effect as to third parties. It follows that the circuit court erred in holding the transaction a conditional sale which would be valid as to all persons having actual notice thereof, even though not filed in the proper office.

A new trial thus becomes necessary.

*By the Court.*— Judgment reversed, and cause remanded for a new trial.